NATIONAL DATA SERVICES OF CHICAGO, INC., Plaintiff-Appellee, v. THE DIRECTOR OF EMPLOYMENT SECURITY, Defendant-Appellant.

Second District    No. 2—00—0078

Opinion filed March 2, 2001.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Darryl B. Simko, Assistant Attorney General, and John P. Schmidt, of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellant.

Robert E. McKenzie, of Arnstein & Lehr, of Chicago, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Director of the Illinois Department of Employment Security (Director), appeals from the judgment of the circuit court of Du Page County reversing her decision. The Director had found that home workers hired by plaintiff, National Data Services of Chicago, Inc., were not independent contractors as defined by section 212 of the Unemployment Insurance Act (Act) (820 ILCS 405/212 (West 1996)). On appeal the Director contends that her decision, finding that plaintiff owed unemployment contributions under the Act because its home workers were employees, rather than independent contractors, was not clearly erroneous.

On June 18, 1996, the Department of Employment Security (Department) determined plaintiff to be an employer and made an assessment that plaintiff was responsible for unpaid contributions to the unemployment insurance fund in the amount of $24,011.38, plus interest, for the periods covering the third and fourth quarters of 1992, all four quarters of 1993 and 1994, and the second through fourth quarters of 1995. The Department's determination and assessment resulted from a claim by one of plaintiff's home workers for unemployment benefits. Plaintiff filed a protest and requested an administrative hearing. A hearing was held before the Director's representative. Testimony was received from plaintiff's president, executive vice president, manager of home contracting services, and several home workers regarding plaintiff's business practices.

The testimony revealed that plaintiff had approximately 100 home workers. These workers provided data entry services for plaintiff's clients. Before plaintiff gave assignments to prospective workers, plaintiff tested their ability to perform the work by providing them with a test batch of cards containing data typical of a normal assignment. To be hired, a worker had to achieve 100% accuracy in keying the data. The worker was required to sign a contract, to have an IBM-compatible computer, and to purchase anti-virus software. The typical worker was a stay-at-home mother. The contract signed by a worker described her as an independent contractor, and the home workers who testified considered themselves to be independent contractors.

Plaintiff provided the workers with software to assist them in doing work although the workers were not required to use it. They could create their own, but, according to Colleen Rice-Prieboy, manager of the home contracting services, no one used her own software. Plaintiff provided home workers with the instructions for an assignment that were based on how the particular customer told plaintiff it wanted its work keyed. The jobs plaintiff assigned to its home workers were to be picked up and dropped off at plaintiff's place of business. The work could be picked up and dropped off for the home worker by another individual. The assignments were left at a counter inside a separate entrance to a small vestibule of plaintiff's building. This was the only access home workers had to the building. They were not allowed entrance to any other part of the building or use of its facilities. Rice-Prieboy and Steve Gruner, plaintiff's executive vice president, testified that this policy was based on the fact that a lot of its in-house work involved confidential information. Denying home workers access to other parts of plaintiff's premises also was for their safety, since plaintiff's premises housed a production center.

Typically, the type of work being performed by home workers was

the data entry of information from warranty cards into files, created by plaintiff's software, onto computer diskettes provided by the home workers. According to Rice-Prieboy, the amount of work assigned to a home worker depended on how much was available and how much the worker wanted. A worker was not required to take a minimum amount of work and could refuse work without repercussion. A worker was required to meet the deadline for return of the work, which was typically three days. Those jobs that required a 24-hour turn-around time, were of a sensitive nature, involved complex documents requiring supervision to complete the task, or required the information to be keyed directly into a database or remote server were performed by 10 in-house employees. These people had set hours, participated in employee benefit packages, were paid every two weeks and on time, and could be promoted.

Home workers were not required to perform services on given days or at given times during the day. They did not receive vacation time, sick pay, retirement pay, or other benefits. Also, home workers were not prohibited from hiring an assistant, although none of those testifying had done so. Home workers could accept data entry work from other companies. They could not solicit or accept business directly from plaintiff's clients.

Plaintiff did not conduct periodic evaluations or formal reviews of home workers as it did with its in-house employees. Nor did plaintiff visit a home worker's home to inspect, supervise, or control work. A home worker's work product was subject to a "compliance review" by plaintiff. After a home worker submitted her work product to plaintiff, plaintiff reviewed the work for accuracy and compliance with the specifications provided for the work. Plaintiff removed charges for any unacceptable work at a piecework rate. The rate of pay was $65 per 1,000 cards. A home worker's services would be terminated if the quality of her work was poor or she was unable to meet job deadlines.

Plaintiff provided its home workers with form invoices on which they would indicate the amount plaintiff owed them for their services. The home workers would submit these invoices along with their finished work product. Steve Gruner testified that he was involved in setting the pricing for plaintiff's customers and for establishing the prices to be paid to home workers for the customers' jobs. Typically, workers were paid by plaintiff once a month, although the parties contracted for payment within 45 days after plaintiff completed its compliance review of a worker's work product. Occasionally, plaintiff was late in paying workers because of cash flow problems.

Plaintiff had a $10 million overall projected revenue. Out of that sum, $1 million was generated by the services provided by home work-

ers. Dennis Dee, plaintiff's president, explained that plaintiff's two primary considerations for deciding to give out work to home workers were the capital outlay and the difficulty in finding 50 full-time employees to do the data entry work that the home workers provided. Steve Gruner stated that it would cost up to $10,000 per work space for each full-time employee that would be needed to perform the services provided plaintiff by a home worker.

The Director's representative found that plaintiff failed to meet its strict burden of proof under all of the provisions of section 212 of the Act and that, therefore, plaintiff's home workers constituted employees, not independent contractors. Plaintiff filed objections to this decision. After reviewing the evidence presented at the administrative hearing, the Director overruled plaintiff's objections, finding that plaintiff had met none of the conditions set forth in section 212. Plaintiff filed a complaint for administrative review in the circuit court of Du Page County. The court reversed the Director's decision, and this appeal ensued.

The Director contends that the trial court erred in reversing her decision that the home workers who perform services for plaintiff are employees rather than independent contractors.

■ Judicial review of the Director's decision is governed by the Administrative Review Law (735 ILCS 5/3—110 (West 1996); 820 ILCS 405/2205 (West 1996)) and encompasses all questions of law and fact presented by the record. *Cohen Furniture Co. v. Department of Employment Security*, 307 Ill. App. 3d 978, 981 (1999). Our role is to review the Director's decision and not the circuit court's determination. *XL Disposal Corp. v. Zehnder*, 304 Ill. App. 3d 202, 207 (1999). The Director's factual findings are held to be *prima facie* true and correct and will not be disturbed unless they are contrary to the manifest weight of the evidence. *Jones v. Department of Employment Security*, 276 Ill. App. 3d 281, 284 (1995). However, questions of law decided by the Department are not entitled to such deference and are reviewed *de novo*. *Cohen*, 307 Ill. App. 3d at 981.

■ When a case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law and a "clearly erroneous" standard of review applies. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). The "clearly erroneous" standard rests somewhere between "manifest weight of the evidence" and *de novo*, requiring the reviewing court to afford some deference to the administrative agency's experience and expertise. *Randolph Street Gallery v. Zehnder*, 315 Ill. App. 3d 1060, 1064 (2000). Under this standard, this court must accept an administrative agency's findings unless we are firmly convinced that the

agency has committed a mistake. *Randolph Street Gallery*, 315 Ill. App. 3d at 1064.

In the present case the relevant facts are undisputed. We must consider whether the Director correctly applied these facts to the elements set forth in section 212 of the Act in reaching her decision that plaintiff's home workers did not meet the independent contractor's exception set forth in that statutory provision. Because this case involves the examination of the legal effect of a given set of facts, it involves a mixed question of fact and law and, therefore, we apply a "clearly erroneous" standard in examining the Director's decision. *City of Belvidere*, 181 Ill. 2d at 205.

■ Section 1400 of the Unemployment Insurance Act requires an employer to make unemployment contributions to a fund with respect to wages payable for employment. 820 ILCS 405/1400 (West 1996); *Cohen*, 307 Ill. App. 3d at 981. The Act is not a taxing act but one passed to alleviate the perils of unemployment and, therefore, it should receive a liberal construction. *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 73 (1991). The Act defines employment as "any service *** performed by an individual for an employing unit." 820 ILCS 405/206 (West 1996). Section 212 of the Act provides an exception to the contribution requirement for services performed by independent contractors. 820 ILCS 405/212 (West 1996); *United Delivery Service, Ltd. v. Didrickson*, 276 Ill. App. 3d 584, 587 (1995).

■ Section 212 of the Act provides the conditions that must be met for a worker to be considered an independent contractor. That section provides:

> "Service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—
>
> A. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and
>
> B. Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> C. Such individual is engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/212 (West 1996).

■ A strict burden of proof is placed upon an employer seeking exemption from unemployment contributions under section 212, and all three conditions must be established before an exemption is al-

lowed. *AFM Messenger Service, Inc. v. Department of Employment Security*, 315 Ill. App. 3d 308, 313 (2000). When interpreting the term "independent contractor" under section 212, our inquiry is directed to the actual rather than the alleged relationship of the parties, and the designations and terminology used in the contracts are not controlling. *AFM Messenger Service*, 315 Ill. App. 3d at 313-14.

■ The first condition that plaintiff must establish is that its home workers were free from its control or direction. Control or direction for the purpose of section 212(A) means that an employer has the right to control and direct the worker, not only as to the work to be done, but also as to how it should be done, whether or not that control is exercised. 56 Ill. Adm. Code § 2732.200(g) (1991). Even though the details of the service performed are left to the individual worker, a worker is under "control" as used in section 212(A) if the worker is under the general control of the employer. *Bennett v. Department of Employment Security*, 175 Ill. App. 3d 793, 797 (1988). The existence of general control is to be determined by examining the particular facts of each case. *AFM Messenger Service*, 315 Ill. App. 3d at 314.

■ In its brief plaintiff lists 25 questions that section 2732.200(g) of the Illinois Administrative Code (56 Ill. Adm. Code § 2732.200(g) (1991)) cites as illustrative of the types of questions the Director will examine in determining whether control or direction exists. Plaintiff then concludes that 22 of the factors support a finding that the home workers were free from direction or control. We, however, agree with the Director that this conclusion is belied by the record. Nonetheless, the type of business being reviewed by the Director and the relationship being examined determine which questions are asked in any given review under section 212(A) of the Act, and no one question or answer or combination of questions and answers will determine whether direction or control exists. 56 Ill. Adm. Code § 2732.200(g) (1991). Rather, the business reality or the totality of the circumstances determines the existence of direction or control. 56 Ill. Adm. Code § 2732.200(g) (1991).

In concluding that plaintiff's home workers were subject to its direction and control, the Director's representative relied almost exclusively, as pointed out by the Director, on the fact that the written contract was drafted by plaintiff. The representative determined that, in a usual independent contractor-employer relationship, it is the independent contractor rather than the employer that drafts the contract for the services to be performed. While a factor to be considered, the Director declined to conclude that this factor, alone, was determinative of the issue of plaintiff's direction and control.

We note, however, that the representative also relied on the fact

that plaintiff could terminate the use of the home worker's services if plaintiff was dissatisfied with the worker's performance. This factor, as pointed out by the representative, has long been determinative of whether an employer-employee relationship exists. See *Rozran v. Durkin*, 381 Ill. 97, 101 (1942).

In her decision the Director determined that plaintiff's control and direction were apparent from the fact that whether plaintiff gave any work to home workers depended upon whether plaintiff's turnaround time was short, whether the clients' information was sensitive, or whether the information was to be keyed directly into a database or a remote server. In such instances, plaintiff determined that the work should be kept in-house with employees performing essentially the same services as home workers. But, where plaintiff's control could be limited to setting a deadline for the return of work and reviewing the final product, plaintiff gave the work out to home workers. In making the distinction as to which jobs should be performed by employees and which should be done by home workers, the Director concluded that plaintiff decided exactly how much control over details it wanted to exercise and that this decision was determinative of general control.

The evidence presented at the administrative hearing showed that plaintiff's home workers were required to follow a routine. The batches of cards, containing the information the workers were to key, were to be picked up and dropped off at plaintiff's place of business during normal business hours. The home workers followed instructions put together by plaintiff indicating how clients wanted the data entered. These instructions accompanied the cards. Typically, the cards were to be returned within three days along with a computer diskette, provided by the home workers, upon which the information had been entered. At the time the work was dropped off, the home worker would submit an invoice, a form provided by plaintiff, indicating the quantity of cards returned. Payment was at the rate of $65 per 1,000 cards.

Although no training was required or provided by plaintiff to be a home worker, plaintiff ascertained a prospective worker's ability to do the data entry work by providing the individual with a test batch of documents. If the worker did not achieve a 100% accuracy rate, she was not hired. The quality of the worker's work product and the ability to meet a deadline were plaintiff's most important requirements, and, if either requirement was not met, a home worker's services were terminated.

The pricing and payment with respect to the services performed by the home workers were controlled by plaintiff. Plaintiff determined what to charge its customers and also decided the piecework rate for

each assignment. Home workers were compensated by plaintiff, not its customers, and once the work product passed plaintiff's "compliance review," plaintiff became obligated to pay the home workers. Thus, as the Director points out, plaintiff bore the risk of noncollection of payment for its customers, a factor that has been identified as evidencing control. *Zelney v. Murphy*, 387 Ill. 492, 504 (1944); *AFM Messenger Service*, 315 Ill. App. 3d at 315.

In an effort to discount the aforementioned facts showing direction or control, plaintiff relies largely, as the Director points out, on freedoms it permitted the home worker to enjoy such as deciding whether to take work and when to work, whether to hire helpers, and whether to work for other data entry companies. Plaintiff cites *United Delivery Service, Ltd. v. Didrickson*, 276 Ill. App. 3d 584 (1995), in support of this position. However, determining whether section 212(A) applies depends upon a case-by-case study. *AFM Messenger Service*, 315 Ill. App. 3d at 314. The fact that comparable freedoms relied upon by the court in *United Delivery Service, Ltd.* formed the basis for the court's decision that the employer did not control or direct the performance of its drivers does not discount the circumstances existing here that established plaintiff's general control. In light of these circumstances, we cannot say that we are firmly convinced that the Director's decision that the home workers were under the general control of plaintiff was clearly erroneous.

Given our determination that plaintiff failed to prove the first condition of section 212 and that all three conditions must be met to obtain exemption from making unemployment contributions, we need not address the arguments raised regarding the other two conditions. We find, therefore, that the trial court erred in reversing the Director's decision.

Accordingly, the judgment of the circuit court of Du Page County is reversed.

Reversed.

HUTCHINSON, P.J., and GEIGER, J., concur.